```
***************************************************
                                        *
In the Matter of the Arbitration        *
                                        *
                                        *
          Between                       *
                                        *
LAUDERDALE TOWING & SALVAGE, Inc.       *
d/b/as SEA TOW FORT LAUDERDALE,         *    DECISION and FINAL AWARD
Claimant,                               *
                                        *
                                        *
          and                           *
                                        *
Skye Molineux, Logan Molineux, and      *
M/Y SKYES THE LIMIT, Respondents        *
                                        *
***************************************************
```

Before:  Stephen H. Busch, Sole Arbitrator

Appearances:      FIORILLI LAW GROUP, P.A., for and on behalf of Sea Tow Fort
                  Lauderdale

                  By: Justin S. Fiorilli, Esq.

                  ROBERT ALLEN LAW, for and on behalf of Skye Molineux,
                  Logan Molineux, and the M/Y SKYES THE LIMIT

                  By: Nicholas J. Zeher, Esq.


### INTRODUCTION


The subject of this arbitration is a dispute involving a salvage claim made

under a U.S. Open Form Salvage Agreement ("the MARSALV Agreement") by

LAUDERDALE TOWING & SALVAGE, d/b/a SEA TOW FORT LAUDERDALE

("Claimant" or "Sea Tow") against Skye Molineux, Logan Molineux and the

M/Y *SKYES THE LIMIT*, ("Respondents" and "*SKYES THE LIMIT*" or "the vessel").

Sea Tow allegedly prevented the vessel from drifting onto an ocean reef near the

entrance to Hillsboro Inlet, FL, after it ran out of fuel on the afternoon of

November 19, 2023. Sea Tow then towed the vessel to Respondents' nearby

waterfront residence.

BACKGROUND

The Parties

According to its Executive Director, Michele Kerrigan, Sea Tow is a Florida

towing and salvage company with headquarters in Fort Lauderdale. It has been

in operation approximately eight years under her direction and maintains a fleet

of four specialized emergency response vessels equipped with towlines,

pumps, hoses, dive gear, inflatable lift bags, and other towing and salvage

equipment. It also maintains a salvage trailer equipped with more than $50,000

worth of additional salvage gear.[1]  The company also employs five full-time

captains, each of whom possesses a U.S. Coast Guard Merchant Mariner license

with an assistance towing endorsement.

---

[1] Claimant's Exhibit E, Affidavit of Michele Kerrigan (2, 6).

One of Sea Tow's captains, Ashley Van Vleck ("Capt. Van Vleck"), captained the Sea Tow vessel involved in the disputed incident.

Skye Molineux is the owner of the M/Y *SKYES THE LIMIT* but was not onboard during the incident. Logan Molineux is his adult son, who was onboard the vessel, and submitted an affidavit.

The Vessels

Respondents' vessel, *SKYES THE LIMIT,* is a 2021, 33-foot Conch center console vessel built by R and R Boatworks in Stuart FL. It is powered by three Mercury outboard engines of 400 HP each. According to Respondents, the fair market value of the vessel is $300,000; according to Sea Tow, it has a value of $445,000. The dispute as to its value will be discussed in further detail, *infra*.

The Sea Tow vessel, *OCEAN 3*, is a 2004, 28-foot Naiad center console, rigid inflatable workboat, powered by two Suzuki outboard engines of 300 HP each. It is equipped for towing and salvage work with an extensive inventory of towing and salvage gear, including, but not limited to pumps, hoses, towlines, lift bags and other related gear. According to Sea Tow, the *OCEAN 3* has a value of approximately $199,255.[2] Capt. Van Vleck was alone on the vessel during the incident.

---

[2] Ibid. (8) See also, Gear inventory of 2004 Naiad (Appendix A to the Kerrigan Affidavit.

The Incident

On November 19, 2023, Skye Molineux hired Captain Joe Deluca ("Deluca") to take his son Logan ("Logan M.") and several of his friends out on *SKYES THE LIMIT* for a day on the water. He knew Logan M. and his friends would be drinking, and wanted a responsible, capable adult in charge of the vessel. Logan M. himself admitted that he and his friends were going to be drinking on the vessel that day.[3]

Capt. Van Vleck was on patrol in the *OCEAN 3* near the entrance to Hillsboro Inlet at Pompano Beach, FL that day. At about 1545 hours he observed *SKYES THE LIMIT* returning to the Inlet, noting there were at least 20 people onboard, some of whom appeared underage. There was a strong ebb tide, with the wind from the northeast at about 10-15 mph.[4] The weather was clear.

Hillsboro Inlet is a short passage between the protected Intracoastal Waterway and the open Atlantic Ocean, running in a roughly northwest to southeast direction. In a report dated February 8, 2024, Captain Timothy Morgan ("Morgan"), who was the owner of Sea Tow Fort Lauderdale from 1995 to 2016, stated that on the south side of the Inlet, approximately 50 feet south of port channel marker 5 and extending about 200 or 300 yards in a southerly

---

[3] Respondents' Composite Exhibit 1, Affidavit of Logan Molineux (2, 5).
[4] Claimant's Exhibit D, Affidavit of Ashley Van Vleck (4-6)

direction, there is a *"rock and dead coral reef,"* about 150 yards offshore.[5]

Morgan, who stated he had saved hundreds of vessels from running afoul of the

reef, also said *"...there is a long history of vessels coming to rest on the Hillsboro*

*Reef and becoming a total loss."*

Capt. Van Vleck stated he saw *SKYES THE LIMIT* reduce speed as it

approached the inlet, but then it suddenly stopped in the middle of the channel

and began drifting uncontrollably with the wind and strong current toward the

*"Danger – Shoal"* marker south of the channel.  Realizing the vessel had lost its

power, Capt. Van Vleck attempted to intercept it before it drifted onto the reef,

which was about 50 feet away from it at that time.[6]

In the meantime, Deluca, who was aware the vessel had run out of fuel,

stated that [he] *"guided it up to a marker where I had some of the passengers*

*hold the "Lilly Pad" between the boat and the marker so there would be no*

*damage to the boat if it bumped into the marker."* [7]  Deluca stated he also told a

passenger, Nick Calice ("Calice"), to grab the anchor and get ready to throw it.

Calice was about to throw the anchor when Capt. Van Vleck arrived on the

scene and offered to assist.[8]  As he made his approach, *SKYES THE LIMIT*

allided with the *"Danger – Shoal"* marker, striking it with allegedly enough force

---

[5] Claimant's Exhibit A: Report of Capt. Timothy Morgan dated February 8, 2024.
[6] VanVleck, (7-11)
[7] Respondents' Composite Exhibit 1, Affidavit of Joe Deluca, (3, 4). A "Lilly Pad" appears to be an inflatable swim raft.
[8] Ibid., (5, 6).

to throw one of the passengers overboard. The vessel bounced off the marker and continued to drift toward the reef, which was then about 30 feet away.[9] Respondents acknowledge the vessel drifted into a marker, but that the impact was minor. Respondents also deny that anyone ever fell overboard. Capt. Van Vleck offered a towline, and Deluca instructed Calice to make it fast on the bow cleat. Once secured, Capt. Van Vleck pulled the vessel away from the reef and back into the channel. Logan M. then asked him to tow the vessel to the Molineux residence in Lighthouse Point, FL., about a mile away.[10] After they arrived there, Capt. Van Vleck noted minor damage to the vessel's port quarter from its allision with the marker, but other than that the vessel appeared to be undamaged. He then presented Logan M. with the MARSALV Agreement, which he signed as agent for the owner.[11] He also checked and initialed the "No Cure, No Pay" term that specified the salvor's compensation would be determined by the provisions of the 1989 International Convention on Salvage. In addition, he signed a Sea Tow Redelivery Statement, acknowledging transfer of the vessel's custody from Sea Tow back to Molineux at 1640 hours November 19.[12] Calise alleges he handed Capt. Van Vleck a can of beer at the Molineux residence and watched him drink it.[13] Capt. Van Vleck vehemently denies this.

---

[9] VanVleck, (12, 13).
[10] Deluca (15).
[11] Van Vleck, (18).
[12] Van Vleck, Appendices A and B to his Affidavit.
[13] Affidavit of Nick Calise, (9)

Capt. Van Vleck departed at approximately 1847 hours to resume his patrol at Hillsboro Inlet.  Several of Respondents' affiants corroborated this.

On November 27, 2023, Sea Tow made a salvage demand of $55,625 to the vessel's owner, Skye Molineux. The amount equates to 12.5% of the vessel's value, which Sea Tow asserts is $445,000. The demand was rejected out of hand by Respondents, who declined to present the claim to the vessel's insurers for fear their premiums would be increased, or that the policy would not be renewed.  Respondents also denied Sea Tow's request to inspect the vessel to ascertain its value more accurately. There were apparently multiple attempts to settle the matter, but all of them were unsuccessful.[14]  Sea Tow then demanded arbitration pursuant to Paragraph Fifth of the MARSALV Agreement, which states:

> "This Agreement shall be governed by and construed in accordance with the Federal Maritime Law of the United States.  Any dispute arising out of this Agreement shall be referred to arbitration in the United States in accordance with the applicable Arbitration Rules of the Society of Maritime Arbitrators, Inc.  Any award made hereunder may include interest, attorney's fees and costs, and shall be final and binding.  For the purpose of enforcement, the Award may be entered for judgment in any court of competent jurisdiction."

---

[14] Claimant's Exhibit F; Affidavit of Justin S. Fiorilli (3)

CLAIMS

Sea Tow claims a sum of $78,781.50 in this proceeding, consisting of its salvage demand of $55,625.00; a professional salvor's uplift of $5,562.00; and its attorneys' fees in the amount of $17,594.50. In addition, Sea tow asks that the costs of the arbitration, including the arbitrator's fee and expenses, be assessed entirely against Respondents.

Respondents reject Sea Tow's claim, based upon Capt. Van Vleck's allegedly inaccurate and/or false statements, and the exorbitant sum demanded by Sea Tow for the minimal amount of assistance he provided.  However, if there is a finding that Sea Tow rendered salvage services, it should be entitled to no more than $3,000.00, which is one percent of the $300,000.00 valuation that Respondents assert is the vessel's fair market value.  In addition, Respondents would deny Sea Tow's request for attorneys' fees, and seek an award of their own attorneys' fees and costs in the amount of $13,753.00.

PROCEEDINGS

The parties were unable to agree upon an arbitrator.  In accordance with Section I of the SMA Rules for Salvage Arbitration, they then asked the president

of the Society of Maritime Arbitrators, Inc. ("SMA") to choose an arbitrator at random from the SMA membership.  On January 11, 2024, I was selected by this process.

The arbitration was conducted by the submission of documents. Each side submitted a position brief and supporting documentary evidence, including photographs, diagrams, expert reports, legal citations and the affidavits of fact and other witnesses. Sea Tow also submitted two videos of the incident taken from cameras mounted on the *OCEAN 3*.  Sea Tow requested and was granted leave to submit a summary of its position, which it did on April 2, 2024. Respondents did not submit a written summary. The proceeding was closed on April 12.

ARGUMENT

Sea Tow submits the service it rendered to Respondents' vessel met the three requirements for its salvage claim to succeed – the existence of peril, a voluntary effort, and success.

First, it argues that *SKYES THE LIMIT*, out of fuel and drifting with the wind and a strong tidal current toward a nearby dangerous reef, was clearly in peril.  With respect to what constitutes peril, Sea Tow cites as examples: *The Blackwall*, 77 U.S. (1869); *The Schooner Clara*, 90 U.S. (1874); *Fort Myers Shell*

9

*and Dredging Company* v. *Barge NBC 512*, 404 F.2d 137, 139 (5th Cir. 1969); and

City *of New York* v. *Andrew J. Barberi*, 534 F.Supp. 2d 370 (E.D.N.Y 2008).

According to these precedents, Sea Tow argues a peril need not be immediate: it

is sufficient that the peril be reasonably apprehended, but this determination

must be made according to the conditions and circumstances extant at the time

of the incident, not at some later time with the benefit of hindsight.[15]  Sea Tow

also argues that *Nicastro* v. *The Peggy B,* 173 F.Supp. 61 (D. Ma. 1959) supports

a general view that "*Vessels adrift or made unnavigable due to mechanical*

*breakdown face sufficient peril to constitute a valid salvage claim.* "  Accordingly,

because *SKYES THE LIMIT* had run out of fuel and was not only without power

to maneuver but drifting uncontrollably with both the wind and outgoing tidal

current towards the Hillsboro Reef, Sea Tow contends there can be no question

it was in imminent danger of grounding and therefore in peril.

Second, Sea Tow points out its services were entirely voluntary, i.e., they

did not arise from a contractual duty owed to Respondents, citing *The Clarita*,

90 U.S. 1, 17 (1874).  In this respect, Sea Tow notes it is primarily a membership

organization for recreational boaters, providing non-emergency towing and

other incidental services to its members.  However, Respondents were not Sea

Tow members, and, even if they were, salvage is specifically excluded as a

---

[15] *Fort Myers* and *Barberi, supra.*

provided service in the Sea Tow Membership Agreement.  Thus, Sea Tow argues there can be no doubt its services were provided voluntarily.

Third, saving the vessel from stranding on the Hillsboro Reef and towing it home was successful.  According to Sea Tow, the only damage to the vessel was some scuffing to the vessel's port quarter that occurred when it drifted into the shoal marker.

With respect to its salvage demand, Sea Tow points out that 12.5 percent of the value of *SKYES THE LIMIT* is not unreasonable when viewed through the lens of other arbitrations involving similar incidents on or near the Hillsboro Inlet Reef.[16]  Moreover, Sea Tow points out that Respondents have offered no legal citations to support their arguments or conclusions, and argues that the affidavits they submitted are unreliable because all bear the same incorrect incident date – November 11, not November 19, and because the affiants had been drinking.  Capt. Van Vleck also strongly denies the allegations by several of Respondents' affiants that he accepted and drank a beer at the Molineux residence, calling them baseless and utterly false.[17]  It is noteworthy that an alleged video Respondents claimed existed showing Capt. Van Vleck drinking a beer was never produced, and Sea Tow contends that both its business

---

[16] E.g., *Coastal Towing & Salvage, Inc.* v. *Dunn Deal,* S.M.A. No. 3913 (2006); and *Coastal Towing & Salvage* v. *Karney,* S.M.A. No. 3866 (2004).
[17] Van Vleck (22).

11

reputation and the professional reputation of Capt. Van Vleck have been significantly harmed by Respondents' false statements regarding this allegation.[18]

Respondents contend that Sea Tow's characterization of the incident is untruthful and blown entirely out of proportion, and assert their vessel was not in peril and did not require assistance. They argue the affidavits of Deluca, Logan M., and eleven other persons in the vessel that day corroborate Respondents' version of the events.[19] In fact, when Capt. Van Vleck offered them a tow line, Deluca stated they were about to deploy their anchor and "[have] *a friend bring us some fuel.*"[20] While acknowledging that the Hillsboro Inlet can be dangerous for inexperienced boaters under certain conditions, Respondents argue that they are experienced boaters, and those conditions were not present on November 19. They contend the sea was calm in the vicinity of *SKYES THE LIMIT*, and the vessel only drifted lightly into the shoal marker. Moreover, it was protected from damage by the Lilly Pad and did not strike the marker with enough force to throw one of its passengers overboard, as Capt. Van Vleck alleges. In addition, the slight damage to the vessel's port quarter was not a result of striking the marker, because it was protected by the "Lilly

---

[18] Sea Tow Reply Brief, Exhibit A (2).
[19] It is worth noting that Respondents' affidavits bear computer ("DocuSign") signatures, are undated, and none are notarized, whereas Claimant's affidavits are dated, bear the affiants' signatures, and are notarized.
[20] Deluca (8).

Pad" passengers placed between it and the vessel, noting this can be seen clearly in Sea Tow's videos.  With respect to the videos, Respondents question why they did not capture the entire incident, but only that portion of it after the *OCEAN 3* was making fast to their vessel. They contend that had the cameras been running when Capt. Van Vleck initially made his approach, they would have shown Calise preparing to throw out the anchor.  Moreover, Respondents argue that Capt. Van Vleck never mentioned the word "salvage," but once he was at Respondents' residence required Logan M., who was not the Master, Owner, Agent, or Underwriter of the vessel to sign the MARSALV Agreement and Redelivery Statement.[21]

When Respondents refused to pay the *"extraordinary"* salvage award Sea Tow demanded, they allege Sea Tow improperly filed a maritime lien against *SKYES THE LIMIT* as a *"scare tactic"* to pressure them to pay.  Sea Tow acknowledges it attempted to file a lien with the U.S. Coast Guard consistent with the provisions of 46 U.S.C. §31301 (5), but the lien was never recorded because the vessel's Certificate of Documentation had expired in 2023. Notwithstanding this, Respondents argue that Sea Tow's filing was in bad faith, and in any event, under the holdings of *Bradford Marine* v. *M/V Sea Falcon*, 64 F.3d 585, 586 (11th Cir. 1995) and *Offshore Marine Towing, Inc.* v. *MR23*, 412 F.3d

---

[21] Respondents assert that Logan's father was not present at this time.

13

1254, 1258 (11th Cir. 2005), Sea Tow may not recover attorney's fees incurred in an *in rem* action to enforce its salvage lien.

Respondents contend Sea Tow's actions did not meet the criteria necessary for a salvage award, and that Sea Tow's salvage demand is no more than a bad faith attempt at a *"shakedown and a money grab."* In the alternative, however, if it is determined that Sea Tow has made out a case for salvage, Respondents argue its demand is entirely out of proportion to the amount of time and effort expended, and suggest an award of no more than $3,000, i.e., one percent of the vessel's $300,000 value is warranted. [22]

## ANALYSIS and DECISION

It is very clear from the undisputed facts and arguments of both parties, that Sea Tow's effort was both voluntary and successful. There is no evidence of any duty or contractual relationship between Sea Tow and Respondents that required Sea Tow to provide a service to Respondents. That Sea Tow's effort was entirely successful is self-evident. Hence, two of the requirements for a salvage claim to succeed have been met, and the only remaining issues for

---

[22] Respondents' Statement of Defense (1, 10, 11).

14

determination are whether *SKYES THE LIMIT* was in peril, and, if so, the salvage reward Sea Tow should receive.

Neither Sea Tow nor Respondents agree as to the exact position of *SKYES THE LIMIT* when Capt. Van Vleck arrived at the scene, but both parties use an overwritten aerial photograph submitted by Sea Tow to depict their respective estimates of where the vessel was.[23] This photograph shows, in north to south order, Hillsboro Light to the north; the No. 4 starboard channel marker; the No. 5 port channel marker, and to the south of that, the danger shoal marker and then the reef. All three of the markers appear to be wooden pilings driven into the seabed.[24] Sea Tow argues that the vessel's position was to the south of the shoal marker, close by the reef. However, Respondents contend the vessel was further from the reef, between the No. 5 channel marker and the shoal marker.[25] In the first few seconds of Sea Tow's "Starboard Video," the vessel's port side can be seen contacting the shoal marker, clearly outside the channel, but not between the shoal marker and the reef. In his report, Morgan stated the reef was about 50 feet south of the No. 5 port channel marker, and given the vessel's position against the shoal marker, I find it reasonable to conclude that it was approximately 30 to 40 feet from the northern end of the reef when Capt. Van

---

[23] Claimant's Statement of Claim (13): Claimant's Exhibit A: Morgan Report, p. 4.
[24] Van Vleck Exhibit C (4). The Danger Shoal marker is distinguishable from the Nos. 4 and 5 channel markers by a diamond – shaped yellow sign with a red border affixed to the top of the piling.
[25]: Respondent's Exhibit 4.

Vleck made fast.  Deluca's allegation that the vessel was never in any danger and had Sea Tow not arrived and offered them a tow, they would simply have anchored and called a friend to bring them some fuel is unpersuasive.  His allegation that the vessel was at no time in danger or peril, and because the tide was going out the vessel would simply have drifted out the channel and into the Atlantic Ocean is also unpersuasive.[26]  As Morgan convincingly pointed out in his report, there was not enough sea room for the scope of anchor line that would have been necessary to prevent *SKYES THE LIMIT* from grounding.[27]  Sea Tow also emphasizes that in average conditions, the length of anchor rode should be seven times the water depth, plus the vessel's freeboard.[28]  Given the tidal current, wind direction, its contact with the shoal marker, and the vessel's 33-foot length, it is evident that if not for Capt. Van Vleck's timely intervention, anchoring the vessel under these circumstances would not have prevented the vessel from drifting onto the reef.

Respondents have argued that Sea Tow's exorbitant salvage demand bears no relationship to the one mile and 15 minutes they state it took to tow the vessel to the Molineux residence.[29]  However, their argument ignores a very

---

[26] Deluca (8, 12).

[27] Morgan Report, p. 3.

[28] Claimant's Reply Brief, p. 4, citing a Westmarine article by Tom Burden: *Selecting an Anchor Rode*, January 4, 2024. The water depth around the shoal marker at the time of the incident is unknown.

[29] Deluca (15).

basic and historic tenet of marine salvage law. Public policy has long recognized, as have the courts and arbitrators, that to foster and encourage the saving of life and property at sea, professional salvors who maintain specialized vessels, equipment, and manpower, able to respond, sometimes at great risk to themselves, at any time of the day or night to assist imperiled vessels, should receive a generous reward, or bounty, above and beyond mere *quantum meruit,* for their efforts when they are successful. This is so even if, as in this case, the time taken to remove the vessel from peril and deliver it to safe harbor is minimal.

I find from the facts and argument that *SKYES THE LIMIT* was in peril and in imminent danger of grounding on the Hillsboro Reef, and that Sea Tow's effort in removing it from peril was an act of salvage.

Paragraph Third of the MARSALV Agreement sets forth the basis upon which the salvor's services are to be performed; No Cure, No Pay; No Cure, No Pay, Fixed Fee; Time and Materials; and Other. Each option has a line next to it for the salved interest to check and initial. In this case, the No Cure, No Pay option was selected and initialed by Logan M. Simply put, No Cure, No Pay means the salvor's reward is conditioned upon successful salvage of the vessel, and when there is success, his compensation will be determined pursuant to

the 10 criteria enumerated in Article 13 of the 1989 International Convention on Salvage. They are, in no order of significance:

(a) the salved value of the vessel and other property;
(b) the skill and efforts of the salvors in preventing or minimizing damage to the environment;
(c) the measure of success obtained by the salvor;
(d) the nature and degree of the danger;
(e) the skill and efforts of the salvors in salving the vessel, other property and life;
(f) the time used and expenses and losses incurred by the salvors;
(g) the risk of liability and other risks run by the salvors or their equipment;
(h) the promptness of the services rendered;
(i) the availability and use of vessels or other equipment intended for salvage operations;
(j) the state of readiness and efficiency of the salvors equipment and value thereof.

The salved value of a vessel is its fair market value post-salvage, i.e., before repairs are made. Sea Tow argues convincingly that the damage to the port quarter of *SKYES THE LIMIT* occurred when it struck the shoal marker, as can be seen in the first few seconds of Sea Tow's "starboard video."[30]  In his affidavit, Deluca acknowledges drifting against the marker, but without incurring any damage as a result.  Moreover, he stated that the damage Sea Tow alleges was preexisting.  Skye Molineux stated in his affidavit:

> *"The damage seen on the **port side** of the Vessel was from when I was in Bimini, Bahamas in early November 2023.  I tied the vessel up to the dock and headed towards the restaurant.  Shortly after, a boat ran by on plane and threw a wake which caused my Vessel to bang into the dock, scrape the **starboard side** wrap and damage the fiberglass."* [31] [emphasis added]

---

[30] Van Vleck, (12, 13).
[31] Affidavit of Skye Molineux, (6)

18

Hence, it would appear that the damage to the port side was, in fact, not preexisting. These inconsistencies support a conclusion that the damage to the port side occurred when the vessel struck the shoal marker. In any event, however, there was no evidence of the cost to repair the damage. Moreover, judging from two photographs of the damage submitted by Sea Tow after the incident, it appears minor enough in my opinion to have little or no practical effect on the vessel's fair market value.[32]

Respondents' allegation the vessel has a fair market value of $300,000 is based on a two-sentence letter dated March 15, 2024, addressed *"To Whom It May Concern"* from Matthew C. Roy, president of Conch Boats ("the Conch letter"). He stated, simply, *"This letter is to confirm the market value of the Conch 33 (HIN: OQL33038I012) is $300,000..."* However, he provided no explanation as to how he arrived at the figure.[33] Respondents also submitted two Conch 33 internet listings. One was a 2021 model with three 300 HP Mercury outboards offered by its owner for $375,000. The other was a 2022 model with only two 300 HP Mercury outboards offered by a dealer for $379,900. Respondents dismiss both as being unrepresentative of the value of *SKYES THE LIMIT,* alleging the internet vessels were in much better condition, one was newer, and each had less use than *SKYES THE LIMIT.* Respondents

---

[32] Van Vleck, Exhibit C 1, 2.
[33] Respondents' Exhibit 2

19

produced no evidence of condition or use, however, and I consider their arguments in this respect to have little merit.  For the same reason, I find the Conch letter to be of no assistance, either.

Because email communications between  counsel (included in Sea Tow's Reply Brief) confirm that Sea Tow's request to inspect *SKYES THE LIMIT* was rebuffed by Respondents, Sea Tow retained a marine surveyor, who appraised the vessel at $445,000.[34]  He based his appraisal on a review of *"Documents, and sales listings for the vessel SKYES THE LIMIT…"* compared to three Conch 33 vessels listed online:  a 2021 model with three 300 HP Mercury outboards for $439,000; a 2022 model with three 300 HP Mercury outboards for $420,000; and a 2022 model with three 300 HP Mercury outboards for $416,000.  Although he did not explain how he arrived at his $445,000 appraisal, the surveyor appears to have found the 2021 listing most comparable, adding an allowance for the additional 300 horsepower on *SKYES THE LIMIT.*

Without evidence of the value and condition of *SKYES THE LIMIT,* it is difficult to compare it to any of the internet listings, but in any event, I do not believe any of the 2022 Conch 33 vessels are appropriate comparisons.  I consider the average of the two 2021 model year internet listings – one by Sea Tow's expert and the other by Respondents – to be most reflective of the value

---

[34] Claimant's Exhibit B: Marine Surveyor Group Appraisal Report by Rollie Gordon, CMS, dated February 5, 2024.

of *SKYES THE LIMIT* and I have added $20,000 to account for the additional 300 horsepower on *SKYES THE LIMIT*.  Therefore, I find the fair market value of the vessel to be $427,000.

Respondents argue the lien Sea Tow attempted to file against the vessel, unsuccessfully, was in any event improper and was done as a *"scare tactic"* to force them to pay Sea Tow's salvage demand.  They have also argued that under *Bradford Marine* and *Offshore Marine Towing, supra,* Sea Tow may not recover legal fees incurred to file a lien.  However, in Paragraph FOURTH, the MARSALV Agreement specifically provides:

> *"The salvor shall have a lien upon the vessel...for services rendered pursuant to Paragraph THIRD.  Salvor's statement for services rendered shall be submitted as promptly as possible after completion or termination of such services.  In lieu of arrest or attachment of the vessel, the Salvor may demand reasonable security for such services from the vessel...at any time, unless otherwise provided for."*

It is therefore clear Sea Tow had a contractual right of lien, and I find it entirely reasonable that they would exercise it when Respondents refused to provide security for Sea Tow's claim.[35] Moreover, as quoted *supra*, Paragraph FIFTH of the MARSALV Agreement specifically permits the awarding and/or allocation of interest, attorney's fees and costs that arise from any dispute under the Agreement.

There is no question that Capt. Van Vleck acted quickly and efficiently in salving *SKYES THE LIMIT*:  he was at the scene and made fast to the vessel

---

[35] Sea Tow's Reply Brief, Exhibit A (1).

before it drifted south of the shoal marker.  Although Capt. Van Vleck stated that after *SKYES THE LIMIT* "bounced *off*" the shoal marker, it "*...continued to drift toward the reef, which was less than thirty feet away at this point,*" [36] neither of the videos show the vessel was ever between the shoal marker and the reef. Nonetheless, given the vessel's lack of any means of propulsion, the combined effects of the wind, tidal current, and its proximity to Hillsboro Reef, it was clearly in imminent danger of grounding.  Although the actions taken by Capt. Van Vleck were as would be expected of an experienced, professional salvor, he was not required to enter the water, deploy pumps, patch a hole, or engage in any other special or dangerous activity, nor did he take any steps to minimize or prevent damage to the environment, although there was never an indication any such steps were necessary or would have been prudent.  For these reasons, I do not find that providing a tow line and pulling the vessel away from danger entailed anything more than the customary practice of good seamanship.

With respect to the weather that day, I find Capt. Van Vleck's description of "*a strong outbound tide with winds from the northeast at approximately 10-15 mph*" to be convincing and supported by the evidence.  Neither he nor Sea Tow ever argued that "*weather conditions... were rough and treacherous, and that the seas were 2-3 feet,*" as Respondents allege.  In fact, Deluca stated, "*The*

---

[36] Van Vleck, (13).

*weather that day was less than one foot* [sic] *and the water was slick.  If it was rougher than that, I would never brought* [sic] *that many people out on the boat...*"[37]  The evidence belies his description.  The Sea Tow videos show a sea state of about one to two feet, confused in the area around the shoal marker, as one would expect the sea to be near a reef with a strong current running.  The current effect is also evident from the wake around the shoal marker, as well as by the yawing of *SKYES THE LIMIT* as the tow gets underway.

The risk to Capt. Van Vleck and the *OCEAN 3* appears to have been low to moderate.  His vessel had full power and maneuverability, and he was an experienced salvor.  There was no evidence that he or his vessel were in danger of grounding, although the videos do show him briefly between the shoal marker and the reef while he was making fast to *SKYES THE LIMIT*.  In addition, the time expended on this salvage effort was minimal.  It took only about three hours from the time Capt. Van Vleck got underway at around 1545 hours until he returned to Hillsboro Inlet at about 1847 hours, and the time used towing *SKYES THE LIMIT* was well under one-half hour.  The amount of fuel used in the operation, as well as Capt. Van Vleck's wages is not known.  According to Sea Tow, the value of *OCEAN 3* and all its equipment is approximately $199,255.  In addition to the value of its vessel, Sea Tow places a value of approximately

---

[37] Deluca (13).

$10,000 on its shoreside monitoring station and electronics.[38]  Respondents

contend the valuations are exaggerated, but I do not find them to be overstated

or irregular, and I accept them as set forth in the affidavit of Michele Kerrigan.

Respondents argue that Logan M. was wrongfully included as a party in

this arbitration because he was not the captain or owner of the vessel, and that

Deluca, as captain, not Logan M., should have signed the MARSALV Agreement

and Redelivery Statement.  Respondents acknowledge that the vessel's owner

was not present when *SKYES THE LIMIT* docked at his residence, and Deluca

stated that Capt. Van Vleck never asked him to sign any documents.[39]  Logan M.,

having submitted an affidavit in the arbitration attesting that "...[he was] *over

the age of 18 and fully capable of drafting this affidavit,"* had legal standing as

an adult.  Moreover, no evidence was produced by Respondents to show the

MARSALV Agreement should be invalidated.  In the absence of such evidence, I

accept Sea Tow's rationale that Logan M. was acting as agent for his father – the

owner – when he signed Sea Tow's documents.

To summarize, for the reasons I have given, I do not find this to be simply

the case of a short tow or very low order salvage, as Respondents have argued.

*SKYES THE LIMIT* was a valuable yacht, powerless and in imminent peril of

grounding on an ocean reef.  With twenty or so people onboard this 33-foot

---

[38] Kerrigan (4).
[39] Deluca (14)

vessel, it was clearly overloaded, and as can be seen in Sea Tow's videos, none of those people were wearing life jackets or vests.

I have carefully reviewed Capt. Van Vleck's actions relative to each of the criteria enumerated in Article 13 of the 1989 Salvage Convention and find that Sea Tow is entitled to a salvage reward of $32,452. In addition, because interest is not a penalty, but compensation for the loss of use of funds, I award interest on the reward at the rate of 8.5 percent per annum from November 19, 2023 to the date of this award.[40]  I also find that Sea Tow, as a professional salvor, is entitled to an equitable uplift of $3,245, plus its attorney's fees and expenses as stated in the amount of $17,594.50.[41]  The costs of the arbitration, including the arbitrators' fee and expenses in the amount of $5,100, are to be borne entirely by Respondents.  However, because Respondents failed to post security in escrow for the arbitrator's fee and expenses as directed early in this arbitration, they are to be paid in the first instance by Sea Tow, who thereafter shall have the right to recover from Respondents those sums paid on Respondents' behalf.

---

[40] The average U. S. Commercial Prime lending rate for the period.
[41] Sea Tow Exhibit F, Affidavit of Justin S. Fiorilli; Sea Tow Reply Brief, p. 6.

## AWARD

Respondents are hereby directed to pay Sea Tow forthwith the sum of $59,993.65, which is arrived at as follows:

| | |
|---|---|
| Salvor's Reward | $32,452.00 |
| Interest on Reward at 8.5% per annum from November 19, 2023 to June 17, 2024 | $ 1,602.15 |
| Equitable uplift | $ 3,245.00 |
| Sea Tow's Attorney's fees and expenses | $17,594.50 |
| Arbitrator's fee and expenses | $ 5,100.00 |
| Total due to Sea Tow | $59,993.65 |

Interest on the principal sum of $32,452.00 is to continue to accrue at the rate of 8.5 percent per annum from June 17, 2024 until the Award is paid, or reduced to judgment, whichever first occurs.

Pursuant to the arbitration provision of the MARSALV Agreement and Title 9, U.S.C., §1 *et seq.*, for purposes of enforcement, this Award may be reduced to judgment in any court of competent jurisdiction.

Stephen H. Busch, Arbitrator

South Bristol, ME
17 June 2024

26